John William KOSTER

v.

Captain George J. SHARP, U.S.N., Commanding Officer Naval Station, Philadelphia, Pennsylvania, John H. Chafee, Secretary of the Navy, Washington, D. C., Melvin Laird, Secretary of Defense, Washington, D. C.

Civ. A. No. 69-1242.

United States District Court
E. D. Pennsylvania.

Aug. 29, 1969.

Benjamin Lerner, Ballard, Spahr, Andrews & Ingersoll, Philadelphia, Pa., for petitioner.

Victor Wright, Asst. U. S. Atty., Philadelphia, Pa., for respondents.

OPINION

MASTERSON, District Judge.

This case raises the issue of whether an enlisted member of the United States Navy may be granted a Writ of Habeas Corpus on the ground that his Naval superiors improperly denied his request for a discharge from military service on the basis of conscientious objection to war.

Since 1962 the Department of Defense has provided a procedure whereby servicemen who become conscientious objectors after their induction may apply for a discharge on this basis. These procedures are embodied in Department of Defense Directive (hereinafter "D.O.D.") 1300.6, which was issued on August 21, 1962, by the then Secretary of Defense pursuant to authority vested in him by 10 U.S.C. § 133. These regulations were amended effective May 10, 1968, 33 Federal Register No. 9, and have been supplemented by the Bureau of Naval Personnel Instruction (hereinafter "BUPERSINST") 1900.5 (July 18, 1968). According to these regulations, an applicant for a conscientious objector discharge is to provide information of his background and a written statement of the beliefs on which he founds his claim. The applicant is then to submit to a psychiatric examination and interviews by a chaplain and an officer knowledgeable in conscientious objector procedures and policies. The interviewers are to record their findings and recommendations and submit them to the commanding officer who, in turn, makes a recommendation on the basis of the in-

formation supplied to him. All of the above findings and recommendations, together with the original application, are then forwarded to the Bureau of Naval Personnel in Washington, D. C., where a "final" determination is made.

Certain passages in D.O.D. 1300.6 suggest that complete discretion in dealing with in-service conscientious objectors is to be retained by the armed forces. Thus, it is stated that conscientious objectors "will be recognized to the extent practicable and equitable"[1] and "[a]dministrative discharge prior to the completion of an obligated term of service is discretionary with the military Service concerned."[2] However, the regulations incorporate by reference statutory standards which govern the determination of whether a conscientious objector discharge should be granted. These standards are the same as those used by the Selective Service System in passing on pre-induction requests for conscientious objector classification.[3]

Generally, to be entitled to a classification as a conscientious objector, the registrant's objection to military service must be by reason of religious training and belief.[4] The term "religious training and belief" does not include essentially political, sociological, or philosophical views, or a merely personal moral code.[5] Also, the conscientious objection must be a general belief against participation in war in any form and not merely an objection to participation in a particular war.[6]

## I. FACTS

The petitioner, John William Koster, is now and has been a practicing member of the Roman Catholic faith. Both of his parents are practicing Catholics, and one of his sisters is a nun. Koster attended Catholic parochial and high schools and completed almost two years at Cleveland State University before he decided, in January, 1968, to enlist in the United States Navy.[7]

Koster successfully completed boot camp and was selected as the Honorman of his company. He participated in further Naval training and was then assigned to the U.S.S. Yosemite as a repairman. In October, 1968, he was scheduled to leave this station and begin advanced training at the Navy's Nuclear Power School, which required that he extend his military commitment from 4 to 6 years. Petitioner reported to this school in November, 1968, but did not enter the training program, allegedly because it was at this time that his gradually evolving beliefs of conscientious objection to war had crystallized, and he no longer felt himself capable of remaining a member of the military.[8]

On or about February 7, 1969, Koster submitted his formal application for a conscientious objector discharge pursu-

1. D.O.D. 1300.6, IV. B.
2. D.O.D. 1300.6, IV. B. 1.
3. D.O.D. 1300.6, IV. B. 3. b.
4. Military Selective Service Act of 1967, section 6(j), 50 U.S.C.A.App. § 456(j).
5. Id.
6. Id.
7. The Navy psychiatrist's report notes that Koster left college because he "rebelled at having to take required courses." The chaplain's report quotes Koster as stating he was " * * * a lost young man, unsure of what to try to achieve, wanting to know what to do with my life * * * the Navy would be a time to think out what I wanted to do with my life." The chaplain's report also notes

that Koster joined the Navy because there was "no choice today—you have the draft waiting for you."

8. Since the respondent makes no claim that Koster's beliefs existed prior to induction or enlistment, the petitioner here is not barred by D.O.D. 1300.6, IV. B. 2. This section of the regulations states that "[A] request for discharge after entering military service based solely on conscientious objection which existed but was not claimed prior to induction or enlistment cannot be entertained * * * However, claims based on conscientious objection growing out of experiences prior to entering military service, but which did not become fixed until entry into the service, will be considered."

ant to D.O.D. 1300.6 and BUPERSINST 1900.5.[9] Substantively, Koster's views are expressed in the following passage from his application:

"My basic beliefs are those of Christ and his ideals. This belief is best expressed by saying that love of God is demonstrated by love of man. The word man—meaning all human beings, regardless of their beliefs, race, creed or nationality. I've found it often harder to live my beliefs than to acquiesce to the pressure of society. All men have their first obligation to their God and their beliefs; and it is from this obligation and love of God that we get the strength to resist society's pressures. It is a result of my desire to please God that I cannot reconcile the idea of taking another human life, nor supporting or belonging to an organization that does so. Being a military man or supporting the military means that I am willing to support killing, or actually kill, and I am not prepared to do that, for it is a contradiction of my beliefs. My love of God drives me to please Him, as it does any religious person, to the best of my capabilities regarding what I believe to be His laws. It was God who created me—not my society—and it will be He who will judge me—not my society—so I must obey what I believe to be His will and law."

On March 10, 1969, Koster was interviewed by Lt. Douglas A. Faulkner, an officer knowledgeable in conscientious objector policies and procedures as required by D.O.D. 1300.6, VI. B. 4. In a letter submitted to the Bureau of Naval Personnel, pursuant to D.O.D. 1300.6, VI. B. 8. a. and BUPERSINST 1900.5, Lt. Faulkner concluded that Koster was sincere in his pacifist beliefs, but that his beliefs were founded on the "rather

simplistic idea that the basis of the Catholic faith is the love of man and the love of God." Nevertheless, Faulkner recommended that since Koster was sincere in his beliefs he should be given non-combatant duties within the Navy.

On November 15, 1968, and again on January 22, 1969, Koster was interviewed by Father Joseph Gallagher, a Catholic chaplain in the Navy. In his letter submitted to the Bureau of Naval Personnel, pursuant to D.O.D. 1300.6, VI. B. 8. b. and BUPERSINST 1900.5, Father Gallagher expressed the opinion that Koster's beliefs "are not based on any religious conviction, and certainly are not any part of the Catholic faith * * * In his confusion, it appears that he has dropped away, for the present, from his religious motivation, so that his present state seems to be more a confused rationalized inconsistent jumble of feelings and emotions against a reality that he naively finds is unpleasant because people are imperfect and violence is objectionable." [10]

On April 8, 1969, after reviewing the above reports, Captain George F. Sharp, Koster's commanding officer, concluded that Koster was sincere in his stated beliefs, but that these beliefs "are not based on his religion or religious training but rather on his own self-styled philosophy and his over rationalization that the expressed purpose of the armed forces is just for the purpose of indiscriminate killing." However, since Koster was sincere in his beliefs, Captain Sharp recommended that he be assigned to non-combatant duties.

All of the above reports, together with the psychiatrist's report and Koster's application, were forwarded to the Bureau of Naval Personnel in Washington, D. C.[11] On April 22, 1969, Captain

9. As required by these regulations, petitioner executed and filed with his application a statement acknowledging that any discharge as a conscientious objector would bar him from certain Veterans Administration benefits to which he would otherwise be entitled.

10. Contrary to the directive contained in D.O.D. 1300.6, VI. 8. b., the chaplain failed to comment as to the applicant's sincerity.

11. Contrary to the regulations, the Bureau of Naval Personnel neglected to seek an

Sharp was notified by letter that the Bureau had denied Koster's request for a discharge because "* * * it is considered that his desire to avoid military service is not based on being conscientiously opposed to participation in war in any form by reason of religious training and belief."[12]

Apparently disregarding Captain Sharp's and Lt. Faulkner's recommendation that Koster be assigned non-combatant duties, the Navy issued Koster orders to report to its Amphibious Warfare Training School at Little Creek, Virginia, where he was to train for approximately three weeks before being transferred to Vietnam.

On June 4, 1969, Koster submitted a second application for discharge which attempted to more thoroughly document and explain the connection between his pacifist beliefs and his views of the teachings of the Roman Catholic faith. This second application was reviewed by four Naval officers who decided that no further action should be taken on it because its contents were determined to be substantially the same as the initial application.[13] Notice of this denial was orally relayed to Koster's attorney on June 5, 1969, which was less than 48 hours before Koster was scheduled to leave the Philadelphia Naval Base in order to report to the Amphibious Warfare School in Virginia.

On June 6, 1969, Koster, by his attorney, filed in this Court a Petition for a Writ of Habeas Corpus and an application for a Temporary Restraining Order. That same day, this Court issued a Temporary Restraining Order on the ground that immediate and irreparable harm would result to the petitioner if the respondents were allowed to remove him from the jurisdiction of the Court and to coerce his participation in activities to which he was fundamentally opposed by reason of his beliefs as a conscientious objector. The respondents were further ordered to show cause why the Writ of Habeas Corpus should not issue, and a hearing to present these claims was set for June 9, 1969. As a result of the arguments presented at the hearing, this Court issued a Preliminary Injunction, to run upon the expiration of the Temporary Restraining Order on June 16, 1969, which enjoined the respondents from further action pending the resolution of the issues before this Court.

## II. JURISDICTION

The petitioner claims that this Court should grant the Writ of Habeas Corpus on the grounds that: (1) on the basis of the administrative record there was no basis in fact for denying the application for a discharge on the ground that Koster's conscientious objection to war was not based on his religious training and belief; and, alternatively, (2) even if the Court were to find basis in fact for

advisory opinion from the Selective Service System as to whether the petitioner would have qualified for a 1-O or 1-A-O classification had his claim been presented in the pre-induction stage. The language of D.O.D. 1300.6, IV. B. 3. c.(1) appears to require such an advisory opinion when an applicant for discharge, like the petitioner here, has had less than 2 years of active service. However, the government does not contend that the absence of the advisory opinion was, or in the circumstances could have been, a factor in the denial of Koster's request. See Hammond v. Lenfest, 398 F.2d 705, 709 n. 4 (2nd Cir. 1968).

12. We note, then, that the denial of Koster's application for discharge was not

based upon the grounds that the relief sought was either "impracticable" or "inequitable". See D.O.D. 1300.6, IV. B. Rather, the denial was based solely on the ground that his objection to participation in war did not stem from his religious training or belief, but from his philosophical or moral views.

13. D.O.D. 1300.6, VI. G. reads: "Commanders as specified by the Military Departments are authorized to return to an applicant, without action, any second or subsequent application when review reveals that it is substantially the same as a previous application disapproved by the Military Department."

the administrative determination, the Writ should issue because the denial of conscientious objector status to one whose beliefs, although sincere, were not religiously motivated, would constitute a violation of the First and Fifth Amendments.

■ The government argues that this Court should not now independently review the matter before it but rather should send the case back to the Navy for another determination on the merits. It should be noted that the Navy has already had two opportunities to review petitioner's application—they denied his original request and refused to consider his second amended application. Also, no suggestion has been made that Koster did not follow the proper procedure in applying for his discharge. The implication in the government's request is that if the Navy misapplied the standards in this case, it would be more appropriate for the Navy to rectify the error rather than this Court. While we recognize and seek to foster the comity which exists between the military and the federal courts, we do not think that it is appropriate for a District Court to relinquish its reviewing powers where, as here, the claim is that the regulatory standards being applied to the petitioner are in themselves offensive to the Constitution. Even short of a constitutional attack on the administrative standards, recent decisions provide ample precedent for a federal court to accept jurisdiction at this stage of the proceedings to determine the factual adequacy of the military's administrative determination. Hammond v. Lenfest,[14] 398 F.2d 705 (2d Cir. 1968); Brown v. McNamara, 387 F.2d 150 (3rd Cir. 1967), cert. denied sub nom. Brown v. Clifford, 390 U.S. 1005, 88 S.Ct. 1244, 20 L.Ed.2d 105 (1968); United States ex rel. Brooks v. Clifford, 409 F.2d 700 (4th Cir. 1969); Crane v. Hedrick, 284 F.Supp. 250 (N.D.Cal.1968); Gann v. Wilson, 289 F. Supp. 191 (N.D.Cal.1968); Cooper v. Barker, 291 F.Supp. 952 (D.Md.1968); Packard v. Rollins, F. No. 2472 (W.D. Mo. April 11, 1969); Benway v. Barnhill, 300 F.Supp. 483 (R.I. June 20, 1969).

■■ The government also contends that the doctrine set out in Orloff v. Willoughby, 345 U.S. 83, 73 S.Ct. 534, 97 L.Ed. 842 (1952), controls our case. In *Orloff*, the Supreme Court held that the federal courts are powerless to interfere with duty assignments of persons lawfully in the armed services. The government's reliance on this doctrine is misplaced for in the case at bar the question is not whether the petitioner has been improperly assigned to duty but rather whether the petitioner is lawfully or unlawfully detained in the Navy. This is an issue properly cognizable by the civilian federal courts.[15]

## III. EXHAUSTION OF REMEDIES

The government argues that Koster's petition to this Court is premature in that he has failed to exhaust remedies

14. The *Hammond* court, on petition for rehearing, sent the petitioner's application back to the Department of the Navy to be processed in accordance with new regulations that had been passed subsequent to the court's original decision. However, the petitioner in the case at bar was processed under those "new" regulations and no supplemental regulations have been issued since the inception of this petition to influence this Court to follow the action of the *Hammond* court on rehearing.

15. This Court has power to issue a writ of habeas corpus based on 28 U.S.C. § 2241(c), as it seems clear that an enlisted member of the armed forces has sufficient restraints on his liberty to be considered "in custody" within the meaning of the statute. Hammond v. Lenfest, supra; Crane v. Hedrick, supra; Gann v. Wilson, supra. Section 2241 provides, in part, that:

"The writ of habeas corpus shall not extend to a prisoner unless—

(1) He is in custody under or by color of the authority of the United States * * *

(2) He is in custody for an act done or omitted in pursuance of an Act of Congress * * *

(3) He is in custody in violation of the Constitution or laws or treaties of the United States * * *."

that are still available through military channels. While the government recognizes that language in the regulations would appear to make the determination by the Bureau of Naval Personnel "final",[16] they argue that although the petitioner has exhausted his administrative remedies, as that term is applied to the regulations, he has not exhausted the remedies available in the military process. In effect, the government contends that the petitioner must violate military law, subject himself to a court martial, and there plead his conscientious objection as a defense before a federal court could properly review the administrative determination made by the Navy. In support of this view we are directed to Noyd v. McNamara, 267 F.Supp. 701 (D.Colo.), aff'd, 378 F.2d 538 (10th Cir.), *cert. denied*, 389 U.S. 1022, 88 S.Ct. 593, 19 L.Ed.2d 667 (1967), where the District Court refused to review the denial of the conscientious objector claim of an Air Force veteran of eleven years because his selective opposition to the war in Vietnam did not make him a total "pacifist".

We believe that *Noyd* can be read as simply reaffirming the doctrine set out in Orloff v. Willoughby, supra, that the civilian courts will not review military duty assignments.[17] Hammond v. Lenfest, supra; Crane v. Hedrick, supra; Packard v. Rollins, supra. Even if *Noyd* can be read as holding that exhaustion of military remedies would be incomplete if the petitioner has not subjected himself to a court martial, the Courts of Appeal for the Second and Fifth Circuits have subsequently decided to the contrary. Hammond v. Lenfest, supra

(2d Cir. 1968); In re Kelly, 401 F.2d 211 (5th Cir. 1968). Additionally, in Brown v. McNamara, 387 F.2d 150 (3rd Cir. 1967) cert. denied sub nom. Brown v. Clifford, 390 U.S. 1005, 88 S.Ct. 1244, 20 L.Ed.2d 105 (1968), our own Circuit Court of Appeals noted the existence of *Noyd* without deciding whether exhaustion by court martial was a prerequisite to relief in the civilian courts. Rather, the court considered the merits of the petitioner's contentions and rejected his claim on the ground that the action of the Army was not arbitrary. See also United States ex rel. Weidman v. Sweeney, 117 F.Supp. 739 (E.D.Pa.1953).

■■ We think the better view is that explicitly expressed by the Second and Fifth Circuits, and implicitly by the Third Circuit, for otherwise the only way someone in petitioner's position could raise his constitutional claims of wrongful detention would be by first committing a military crime by disobeying an order and facing the possibility of imprisonment, as well as having to bear the stigma and attendant prejudices that attach to one dishonorably discharged from the armed forces. It should also be noted that the petitioner has no assurance that this route, if desired, would be available to him at all since the military authorities have the sole discretion to convene a court martial.[18] Furthermore, there is no indication that a court martial would consider the claim of conscientious objection if it were raised as a defense in the court martial proceedings. See Hammond v. Lenfest, supra; Cooper v. Barker, supra, 291 F.Supp. at 960 n. 11. For the above reasons, this Court rejects the assertion that the right to defend

---

16. D.O.D. 1300.6, VI. E. and IV. B. 3.

17. The court of appeals in *Noyd* noted that "the essence of appellant's claim is that the federal judiciary should review and determine the validity of military assignments to duty. This we cannot do." 378 F.2d at 540. Another ground of distinction with the *Noyd* case is that Koster's conscientious objection is not "selective" in that he is opposed to war in any form.

18. Professor Jaffe has written that where "[o]ne must at his risk await such further enforcing procedure as the agency chooses to initiate * * * in such cases the exhaustion doctrine is inapplicable: the person has no remedy." Jaffe, The Exhaustion of Administrative Remedies, 12 Buff.L.Rev. 327, 329 (1963), cited in Hammond v. Lenfest, supra, 398 F.2d at 714.

against a court martial is a realistic "remedy" available to the petitioner that must be exhausted before review by the civilian courts can be entertained.[19]

## IV. THE STANDARD OF "RELIGIOUS TRAINING AND BELIEF"

■■ In the above-cited cases where the federal courts have accepted subject matter jurisdiction to pass on the factual adequacy of the military's administrative determination, the courts have generally adopted the "no basis in fact" standard as the applicable scope of review. Under such a test, the court must determine whether there was any basis in fact for the military's conclusion that at the time of filing the application for a conscientious objector discharge the petitioner would not have been classified as a conscientious objector if he were being considered for induction by the Selective Service System. Such an approach requires the examination of the administrative record to evaluate the strength and source of the petitioner's beliefs.

■ In this case, there is no question as to the applicant's sincerity. Both his commanding officer and the interviewing officer, who is skilled in these matters, attested to it, and the chaplain made no contrary statements. Further, the chaplain's and interviewing officer's finding that the petitioner's scruples were not based on any religious training

and belief expresses the narrowest and most sectarian view of religion which has been held to be impermissible in parallel cases. United States v. Bowles, 131 F.2d 818 (3rd Cir. 1942), aff'd 319 U.S. 33, 63 S.Ct. 912, 87 L.Ed. 1194, rehearing denied, 319 U.S. 785, 63 S.Ct. 1323, 87 L.Ed. 1728 (1943); see also United States v. Seeger, 380 U.S. 163, 85 S.Ct. 850, 13 L.Ed.2d 733 (1965), and cases following. Accordingly, we hold that the administrative finding that the petitioner is not entitled to discharge because his scruples are not a result of religious training and belief is not supported by any evidence in his record.

■ More fundamentally, even if there were some support for the administrative finding, we also hold that the standard of "religious training and belief" [20] is violative of the First Amendment stricture against the establishment of religion and of the Fifth Amendment's guarantee of due process of law. See United States v. Sisson, 297 F.Supp. 902 (1969) (per Wyzanski, J.).

As stated by the Supreme Court in Everson v. Board of Education, 330 U.S. 1, 15, 67 S.Ct. 504, 511, 91 L.Ed. 711 (1947):

"[T]he 'establishment of religion' clause of the First Amendment means at least this: Neither a state nor the Federal Government can set up a church. Neither can pass laws which aid one religion, *aid all religions*, or

---

19. In this case, the government did not contend that Koster's failure to appeal the denial of his request for a conscientious objector discharge to the Board for Correction of Naval Records constitutes a failure to exhaust administrative remedies. The creation of this Board is authorized by 10 U.S.C.A. § 1552 to "correct any military record * * * when it considers it necessary to correct an error or remove an injustice." The Circuits are split on whether one denied a discharge must first appeal the rejection of his application to the Board before he can seek review by the civilian courts. We follow the view established by the Fourth Circuit in United States

ex rel. Brooks v. Clifford, 409 F.2d 700 (4th Cir. 1969), aff'd on rehearing, United States ex rel. Brooks v. Clifford, 412 F.2d 1137 (4th Cir. June 25, 1969), that such a course need not be travelled before relief in the civilian courts may properly be sought. This view has also been adopted in Gann v. Wilson, supra, and Packard v. Rollins, supra. See also 2 Selective Service Law Reporter 1 (dated April 19, 1969, but not published until June, 1969). Contra: Craycroft v. Ferrall, 408 F.2d 587 (9th Cir. 1969).

20. Set out at 50 U.S.C.A.App. § 456(j) and incorporated by reference in D.O.D. 1300.6 at section IV. B. 3. b.

prefer one religion over another. * * * " (emphasis supplied)[21]

 Under the *Everson* test, a regulation which makes exemption from military service dependent upon the applicant's religious belief is, on its face, defective. Further, a standard which exempts a religiously motivated conscientious objector from military service and denies the same relief to a person whose beliefs are just as sincere but which are not motivated by any relationship to any religion is constitutionally defective under the Fifth Amendment's guarantee of due process of law. We concur in Judge Wyzanski's assessment that "* * * it is difficult to imagine any ground for a statutory distinction except religious prejudice." United States v. Sisson, supra, 297 F.Supp. at 911.

 The result we reach in this case is in no way affected by the fact that the regulation under which the petitioner seeks a discharge can itself be considered a matter of administrative "grace". Although there may have been no constitutional requirement that the Department of Defense establish the regulations in question, we find that once the Department has instituted these regulations they must at least pass constitutional muster.

 The practical effect of our decision, then, is to leave as the sole ground for determination the test of whether the applicant for a conscientious objector discharge is sincere in his objection to war in any form. Since the Navy has already found Koster to have satisfied

this test, there is no reason for this Court to send the case back to the Navy for a further determination. Accordingly, we grant the petitioner's request for a writ of habeas corpus and order that he be honorably discharged in accordance with the regulations.[22]

---

21. In Torcaso v. Watkins, 367 U.S. 488, 493, 81 S.Ct. 1680, 6 L.Ed.2d 982 (1960), the Court discusses how, in Illinois ex rel. McCollum v. Board of Education, 333 U.S. 203, 68 S.Ct. 461, 92 L.Ed. 649 (1948), they were urged to repudiate as dicta the above-quoted *Everson* interpretation of the scope of the First Amendment. The Court notes that they declined to do so, but instead strongly reaffirmed what had been said in *Everson*.

22. D.O.D. 1300.6, IV. B. 3. specifies that the type of discharge, i. e. honorable or

general, to be given "will be determined by the person's military record." Since the only references to petitioner's military record before us show that it has been exemplary, we have inferred that the petitioner is entitled to an honorable discharge. If such is not a fact, respondent, upon proffering supporting evidence, may make timely application for a recall of the mandate and modification of the opinion.